JERRY E. SMITH, Circuit Judge:
Twenty-six states (the “states”) are challenging the government’s[1] Deferred Action for Parents of Americans and Lawful Permanent Residents program (“DAPA”) as violative of the Administrative Procedure Act (“APA”) and the Take Care Clause of the Constitution. The district court determined that the states are likely to succeed on their, procedural APA claim, so it temporarily enjoined implementation of the program. Texas v. United States, Civ. No. B-14-254, — F.Supp.3d —, 2015 WL 648579 (S.D.Tex. Feb. 16, 2015). The United States appealed the preliminary injunction and moved for a stay of the injunction pending resolution of the merits of that appeal. Because the government is unlikely to succeed on the merits of its appeal of the injunction, we deny the motion for stay and the request to narrow the scope of the injunction.
I.
In 2012, then-Department of Homeland Security (“DHS”) Secretary Janet Napoli-tano announced the Deferred Action for Childhood Arrivals program (“DACA”), setting forth how officers should exercise “prosecutorial discretion” before enforcing “immigration laws against certain young people.”[2] She instructed agency heads *744 that five criteria “should be satisfied before an individual is considered for an exercise of prosecutorial discretion”[3] but that “requests for relief ... are to be decided on a case by case basis.”[4] “For individuals who are granted deferred action ... [U.S. Citizenship and Immigration Services (“USCIS”) ] shall accept applications to determine whether these individuals qualify for work authorization,” but the DACA Memo purported to “eonfer[] no substantive right, immigration status or pathway to citizenship.”[5] Of the at least 1.2 million persons who qualify for DACA, approximately 636,000 have been accepted through 2014.[6]
In November .2014, DHS Secretary Jeh Johnson instructed the same agencies to expand DACA in three areas.[7] He also “direct[ed] USCIS to establish a process, similar to DACA,” known as DAPA. He set forth six criteria “for exercising prose-cutorial discretion through the use of deferred action, on a case-by-case basis.”[8] Although “[d]eferred action does not confer any form of legal status in this country, much less citizenship[,] it [does] meant ] that, for a specified period of time, an individual is permitted to be lawfully •present in the United States.”[9]
That designation makes aliens who were not otherwise qualified for most federal public benefits eligible for “social security retirement benefits, social security disability benefits, [and] health insurance under Part A of the Medicare program.”[10] Fur *745 ther, “[e]ach person who applies for deferred action pursuant to the [DAPA] criteria ... shall also be eligible to apply for work authorization for the [renewable three-year] period of deferred action.”[11] “An alien with work authorization may obtain a Social Security Number”; “accrue quarters of covered employment”; and “correct wage records to add prior covered employment within approximately three years of the year in which the wages were earned or in limited circumstances thereafter.” [12] The district court determined that “DAPA recipients would be eligible for earned income tax credits once they received a Social Security number.”[13] Texas maintains that DAPA recipients become eligible for driver’s licenses and unemployment benefits.[14] Of the approximately 11.3 million illegal aliens[15] in the United States, 4.3 million are eligible for DAPA. Texas, — F.Supp.3d at & n. 11, —, 2015 WL 648579, at *7 & n. 11, *15.
The states sued to prevent implementation of the program. First, they claimed that DAPA is procedurally unlawful under the APA because it is a substantive rule thát is required to undergo notice and *746 comment, but DHS had not followed those procedures. See 5 U.S.C. § 558. Second, the states asserted that DAPA was substantively unlawful under the APA because DHS. lacked the authority to implement the program even if it did follow the correct process. See 5 U.S.C. § 706(2)(A)-(C). Third, the states contended that DAPA violated the President’s constitutional duty to “take Care that the Laws be faithfully executed.” U.S. Const. art. II, § 3.
The district court held that Texas had standing because it would be required to issue driver’s licenses to DAPA beneficiaries, and the costs of doing so would constitute a cognizable injury. Texas, — F.Supp.3d at — - —, 2015 WL 648579, at *11-17. Alternatively, the court held that Texas had standing based on a theory it called “abdication standing,” under which a state has standing if the government has exclusive authority over a particular policy area but declines to act. Id. at — - —, 2015 WL 648579 at *28-34.[16] The court entered the preliminary injunction after concluding that Texas had shown a substantial likelihood of success on its claim that DAPA’s implementation would violate the APA’s notice-and-comment requirements. Id. at —, 2015 WL 648579 at *62. The court did not “address[] Plaintiffs’ likelihood of success on their substantive APA claim or their constitutional claims under the Take Care Clause/separation of powers doctrine.” Id. at —, 2015 WL 648579 at *61. The government’s motion for a stay pending appeal is based on its insistence that the states do not have standing or a right to judicial review under the APA and, alternatively, that DAPA is exempt from the notice-and-comment requirements. The government also urges that, the injunction’s nationwide scope is an abuse of discretion.[17]
II.
‘We consider four factors in deciding whether to grant a stay pending appeal: ‘(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other par *747 ties interested in the proceeding; and (4) where the public interest lies.’ ”[18] To succeed on the merits, the government must show that the district court abused its discretion by entering a preliminary injunction.[19] A decision “grounded in erroneous legal principles is reviewed de novo,” and findings of fact are reviewed for clear error.[20] “A stay ‘is not a matter of right, even if irreparable injury might otherwise result to the appellant.’ ”[21]
III.
We begin by deciding whether the government has made a strong showing that it is likely to succeed on the merits of its claim that the states lack standing. It has not done so. We reach only the district court’s first basis for standing — the driver’s license rationale — because it is disposi-tive.[22]
The states have the burden of establishing that at least one of them has Article III standing.[23] First, they must *748 assert an injury that is “concrete, particularized, and actual or imminent.”[24] “ ‘[Threatened injury must be certainly impending to constitute injury in fact,’ and ... ‘[ajllegations of possible future injury’ are not sufficient.”[25] Second, the injury must be “fairly traceable to the challenged action.” Clapper, 133 S.Ct. at 1147 (quoting Monsanto, 561 U.S. at 149, 130 S.Ct. 2743). The states may establish standing based on costs they incur as a reasonable reaction to a risk of harm only if that harm is certainly impending. See id. at 1151. Third, the injury must be “redressable by a favorable ruling.” Id. at 1147 (quoting Monsanto, 561 U.S. at 149, 130 S.Ct. 2743). “When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.” Massachusetts, 549 U.S. at 518, 127 S.Ct. 1438.
A.
The first requirement is likely satisfied by Texas’s proof of the costs of issuing driver’s licenses to DAPA beneficiaries. “An applicant who is not a citizen of the United States must present ... documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver’s license.” Tex. TRANSP. Code § 521.142(a). Documentation confirming lawful presence pursuant to DAPA would qualify.[26] The district court found that Texas would lose at least $130.89 on each license it issues to a DAPA beneficiary,[27] and the United States does not dispute that calculation on appeal. It is well established that a financial loss generally constitutes an injury,[28] so Texas is likely to meet its burden.
The government attacks that conclusion on two grounds. First, it claims that Texas will be required neither to issue licenses nor to subsidize them. Texas responds that it will have to do so in light of Arizona DREAM Act Coalition v. Brewer, 757 F.3d 1053 (9th Cir.2014), which held that DACA beneficiaries were likely to succeed on their equal-protection challenge to Arizona’s policy of issuing licenses to *749 some noncitizens but not to them, id. at 1067, and suggested but did not decide that the policy was preempted, id. at 1063. Although Arizona DREAM Act supports Texas’s position that it cannot legally deny licenses to DAPA beneficiaries, it is not dispositive. Even if we were bound by the decision of another circuit, that court said nothing about subsidizing licenses, and Texas could avoid financial injury by raising its application fees to cover the full cost of issuing and administering a license.
But that does not resolve the matter. The flaw in the government’s reasoning is that Texas’s forced choice between incurring costs and changing its fee structure is itself an injury: A plaintiff suffers an injury even if it can avoid that injury by incurring other costs.[29] And being pressured to change state law constitutes an injury.
“[S]tates have a sovereign interest in ‘the power to create and enforce a legal code.’ ”[30] Based on that interest, we held that Texas had standing to challenge the FCC’s assertion of authority over an aspect of telecommunications regulation that the state believed it controlled[31]; three other circuits held that the preemption of an existing state law constitutes an injury[32]; and the Sixth Circuit held that making the enforcement of an existing state law more difficult qualifies.[33] Reviewing that caselaw, the Fourth Circuit explained that a state has standing based on a conflict between federal and state law if “the state statute at issue regulate[s] behavior or provide[s] for the administration of a state program,” Virginia ex rel. Cuccinelli v. Sebelius, 656 F.3d 253, 269 (4th Cir.2011), but not if “it simply purports to immunize [state] citizens from federal law,” id. at 270.
That well-established caselaw is disposi-tive because if pressure to change state law in some substantial way were not injury, states would have no standing to challenge bona fide harms because they could offset most financial losses by raising taxes or fees. Texas’s forced choice between incurring costs and changing its laws is an injury because those laws exist for the administration of a state program, not to challenge federal law, and Texas did not enact them merely to create standing.[34]
*750 ' Second, the government urges that Texas will suffer no injury, because the costs of issuing licenses will be outweighed by countervailing economic benefits, including increased, tax revenue, decreased reliance on state-subsidized health care, better financial support for DAPA beneficiaries’ children, increased revenue from vehicle-registration fees, and decreased auto insurance costs. All that may be true, but those benefits are not properly weighed in evaluating standing here. We have addressed the question of offsetting benefits only to a limited extent, holding that individuals lacked taxpayer standing to challenge Louisiana’s issuance of pro-life license plates in part because the extra fees paid by drivers who purchased the plates could have covered the expenses associated with offering them and distributing the funds they raised. Henderson, 287 F.3d at 379-81.
That approach is appropriate, if at all, where the costs and benefits are of the same type and arise from the same transaction because the plaintiff has suffered no real injury. By contrast, other circuits have declined to consider offsetting benefits of different types or from different transactions.[35] Our sister circuits’ approach makes sense in that context because attempting to balance all costs and benefits associated with a challenged policy would leave plaintiffs without standing to challenge legitimate injuries, given that defendants could point to unrelated benefits, improperly shifting to the plaintiffs the burden of showing that the costs outweigh them.
Most of the benefits the government cites — increased tax revenue, decreased reliance on state-subsidized health care, and better financial support for DAPA beneficiaries’ children — are wholly separate from the costs of issuing licenses. The other benefits it identifies — increased revenue from vehicle fees and decreased auto insurance costs — -are more closely associated with the costs of issuing licenses, but the caselaw illustrates that they are *751 still too far removed to be applied as offsets.
For example, in NCAA, 730 F.3d at 222-23, the Third Circuit held that sports leagues had standing to challenge New Jersey’s plan to license sports betting even though the damage to the leagues’ reputations could have been outweighed by increased interest in watching sports. Likewise, in Markva, 317 F.3d at 557-58, the Sixth Circuit held that grandparents who cared for dependent children had standing to challenge a requirement that they spend more of their own money before obtaining Medicaid benefits, as compared to similarly situated parents, even though the grandparents arguably received more of other types of welfare benefits. Here] as in those cases and others,[36] the benefits the government cites concern the same subject matter as the costs but do not arise from the same transaction, so we cannot consider them. Accordingly, Texas has likely asserted an injury that is “concrete, particularized, and actual or imminent.” Clapper, 133 S.Ct. at 1147 (quoting Monsanto, 561 U.S. at 149, 130 S.Ct. 2743).
B.
Texas is likely to satisfy the second requirement by showing that its injury is “fairly traceable to the challenged action.” Id. (quoting Monsanto, 561 U.S. at 149, 130 S.Ct. 2743). As we have explained,[37] it is undeniable that DAPA would enable beneficiaries to apply for licenses, but the United States asserts that DAPA’s incidental consequences are not cognizable injuries because the causal link is too attenuated. Massachusetts v. EPA establishes, much to the contrary, that Texas’s injury suffices.
In Massachusetts, 549 U.S. at 526, 127 S.Ct. 1438, the Court held that the erosion of the state’s shoreline gave it standing to challenge the EPA’s decision not to regulate greenhouse-gas emissions from new motor vehicles. The Court noted that the Clean Air Act authorizes judicial review of the EPA’s denial of a rule-making petition, a fact that “is of critical importance to the standing inquiry [because] ‘Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.’ ” Id. at 516, 127 S.Ct. 1438 (quoting Defenders of Wildlife, 504 U.S. at 580, 112 S.Ct. 2130). Moreover, “States are not normal litigants for the purposes of invoking federal jurisdiction,” id. at 518, 127 S.Ct. 1438, because they surrendered some of the sovereign powers necessary to protect themselves from harms such as climate change when they joined the union, id. at 519, 127 S.Ct. 1438. That point was especially relevant because the EPA’s inaction had caused the erosion of Massachusetts’s sovereign territory. See id. “Given that procedural right and Massachusetts’s stake in protecting its quasi-sovereign interests, the Commonwealth [was] entitled to special solicitude in [the] standing analysis.” Id. at 520, 127 S.Ct. 1438.
This case implicates the same concerns. Texas is exercising a procedural right: Just as the Clean Air Act (“CAA”) authorizes judicial review of “final action taken[ ] by the Administrator,” 42 U.S.C. *752 § 7607(b)(1), the APA authorizes judicial review, of “final agency action for which there is no other adequate remedy in a court,” 5 U.S.C. § 704.[38] And Texas is protecting its quasi-sovereign interest in not being forced to choose between incurring costs and changing its driver’s license regime.[39] Therefore, it is entitled to the same “special solicitude” as was Massachusetts.[40]
The analysis of the “fairly traceable” requirement in Massachusetts is also highly relevant. The main causation issue was whether the connection between the EPA’s inaction and the state’s injury was too remote. See Massachusetts, 549 U.S. at 523, 127 S.Ct. 1438. The EPA maintained that the injury was not cognizable, because regulating greenhouse-gas emissions from new motor vehicles would have done little to prevent the erosion of the state’s land. Id. at 523-24, 127 S.Ct. 1438. The Court rejected that theory, explaining that the fact “[t]hat a first step might be tentative does not by itself support the notion that federal courts lack jurisdiction to determine whether that step conforms to law” and that “reducing domestic automobile emissions [was] hardly a tentative step,” in any event. Id. at 524, 127 S.Ct. 1438.
The answer here is the same. Although Texas would not be directly regulated by DAPA, the program would have a direct and predictable effect on the state’s driver’s license regime, and the impact would be significant because at least 500,000 po-' tential beneficiaries live in the state. Alternatively, Texas could change its law, but being pressured to do so is itself a substantial injury, as already discussed.
By contrast, where the Supreme Court has found that an injury is not fairly traceable, the intervening, independent act of a third party has been a necessary condition of the harm’s occurrence, or the challenged action has played a minor role. For instance, the plaintiffs in Clapper *753 lacked standing to challenge a section of the Foreign Intelligence Surveillance Act that they alleged would lead to the monitoring of their communications. Clapper, 133 S.Ct. at 1155. For the asserted injury to occur, the Attorney General and the Director of National Intelligence would have had to authorize the collection of communications to which the plaintiffs were a party, the Foreign Intelligence Surveillance Court would have had to approve the surveillance, and the government would have had to succeed in intercepting the communications. Id. at 1148. Emphasizing its “usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors,” the Court held that the plaintiffs had not satisfied the “fairly traceable” requirement.[41] Separately, the Court rejected the theory “that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful — whether a trademark, the awarding of a contract, a landlord-tenant arrangement, or so on.” Already, LLC v. Nike, Inc., — U.S. -, 133 S.Ct. 721, 731, 184 L.Ed.2d 553 (2013). Myriad factors determine market shares, so it is difficult to trace a competitive injury to a particular decision benefiting a competitor.[42]
Texas’s claim regarding driver’s licenses suffers from neither of those deficiencies. The only intervening act of a third party is the beneficiaries’ decisions to apply for licenses, but it is hardly speculative that they will do so — driving is a practical necessity in most of Texas, especially to get and hold a job, so many beneficiaries will be eager to obtain licenses. Further, DAPA is the only substantial cause of Texas’s injury. In short, given the “special solicitude” that the Supreme Court directs us to afford to Texas, the parallels between this case and Massachusetts, and the differences between this case and those in which the Supreme Court has not found standing, the states are likely to satisfy the “fairly traceable” requirement.
C.
The third requirement, that the injury be “redressable by a favorable ruling,” Clapper, 133 S.Ct. at 1147 (quoting Monsanto, 561 U.S. at 149, 130 S.Ct. 2743), is easily met here. Enjoining the implementation of DAPA until it undergoes notice and comment could prompt DHS to reconsider its decision, which is all a litigant must show when asserting a proce *754 dural right. See Massachusetts, 549 U.S. at 518, 127 S.Ct. 1438.
Thus, the government has not made a strong showing that it is likely to succeed on the merits of its notion that the states lack standing. At least one state—Texas—is likely to satisfy all three requirements, so the government’s challenge to standing is without merit.
IV.
In addition to having standing, the states must seek to protect interests that are “arguably within the zone of interests to be protected or regulated by the statute ... in question.”[43] Under “the ‘generous review provisions’ of the APA,”[44] that “test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.”[45] “We apply the test in keeping with Congress’s ‘evident intent’ when enacting the APA ‘to make agency action presumptively reviewable,’ ” and “the benefit of any doubt goes to the plaintiff.”[46] The states would fail the test only if their “interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.”[47]'
The government has not made a strong showing that the interests the states seek to protect fall outside the zone of interests of the Immigration and Nationality Act (“INA”). “The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States,” which “bear[ ] many of the consequences of unlawful immigration.” Arizona v. United States, — U.S. —, 132 S.Ct. 2492, 2500, 183 L.Ed.2d 351 (2012). In recognition of that fact, Congress permits states to deny many benefits to illegal aliens.[48] Knowing that they may not enforce laws that, conflict with federal law, see, e.g., Arizona, 132 S.Ct. at 2510, the states seek only to be heard in the formulation of immigration policy before it imposes. substantial costs on them. “Consultation between federal and state officials is an important feature of the immigration system,” id. at 2508, and the notice-and-comment process, which “is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making,”[49] facilitates such communication. The states easily satisfy the zone-of-interests test.
V.
In deciding whether the United States has made a strong showing that judicial *755 review is precluded, we are mindful that “[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.”[50] But judicial review is unavailable “to the extent that — (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.” 5 U.S.C. § 701(a).
A.
“[O]nly upon a showing of ‘clear and convincing evidence’ of a contrary legislative intent should the courts restrict access to judicial review.” Block v. Cmty. Nutrition Inst., 467 U.S. 340, 350, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). That “standard is not a rigid evi-dentiary test but a useful reminder ... that, where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling.” Id. at 351, 104 S.Ct. 2450. “Whether and to what extent a particular statute precludes judicial review is determined not only from lts express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.” Id. at 345, 104 S.Ct. 2450.
The United States maintains that 8 U.S.C. § 1252(g)[51] expressly prohibits judicial review, but that provision is not “a sort of ‘zipper’ clause that says ‘no judicial review in deportation cases unless this section provides judicial review’ instead, it “applies only to three discrete actions that the Attorney General may take: her ‘decision or action’ to ‘commence proceedings, adjudicate cases, or execute removal orders.’ ”[52] It is inapplicable here because (1) the states are not bringing a “cause or claim by or on behalf of any alien,” and (2) the action does not “aris[ej from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien.” § 1252(g).
Nor does the government’s broad and exclusive authority over immigration policy mean that review is implicitly barred.[53] The INA has numerous specific jurisdiction-stripping provisions[54] that *756 would be rendered superfluous by application of an implied, overarching principle prohibiting review.[55] Such a conclusion would be contrary to AAADC, 525 U.S. at 482, 119 S.Ct. 936, in which the Court noted that § 1252(g) does not “impose a general jurisdictional limitation; and that those who enacted IIRIRA were familiar with the normal manner of imposing such a limitation.”[56]
Moreover, judicial review of an action brought by states to enforce procedural rights under the APA is consistent with the protections Congress affords to states that decline to provide benefits to illegal aliens. As we have explained,[57] Texas, as permitted by § 1621, subsidizes driver’s licenses to, inter alia, lawfully present aliens but declines to issue them to those unlawfully present. And the state seeks to participate in notice and comment before the Secretary changes the designation of 500,000 aliens residing there in such a way that would cause the state to incur substantial costs.
The Supreme Court’s discussion of deferred action in AAADC suggests that judicial review may be available if there is an indication that deferred-action decisions are not made on a case-by-case basis. There, a group of aliens sought to stop deportation proceedings against them, but § 1252(g) deprived the courts of jurisdiction. AAADC, 525 U.S. at 487, 119 S.Ct. 936. Noting that § 1252(g) codified the Secretary’s discretion to decline “the initiation or prosecution of various stages in the deportation process,” id. at 483, 119 S.Ct. 936, the Court observed that “[pjrior to 1997, deferred-action decisions were governed by internal [Immigration and Naturalization Service (“INS”) ] guidelines which considered [a variety of factors],” id. at 484 n. 8, 119 S.Ct. 936. Although those guidelines had since been rescinded, the Court noted that “there [was] no indication that the INS has ceased making this sort of determination on a case-by-case basis.” Id. The United States has not rebutted the strong presumption of reviewability with clear and convincing evidence that the INA precludes review.[58]
B.
The Secretary does, .nonetheless, have broad enforcement discretion and maintains that deferred action under DAPA — a grant of “lawful presence” and subsequent eligibility for otherwise unavailable benefits — is a presumptively un-reviewable exercise of that discretion.[59] *757 “The general exception to reviewability provided by § 701(a)(2) for action ‘committed to agency discretion’ remains a narrow one, but within that exception are included agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise.”[60] When, however, “an agency does act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to determine whether the agency exceeded its statutory powers.” Chaney, 470 U.S. at 832, 105 S.Ct. 1649.
Some features of DAPA are similar to prosecutorial discretion: DAPA amounts to the Secretary’s decision — at least temporarily — not to enforce the immigration laws as to a class of what he deems to be low-priority aliens.[61] If that were all DAPA involved, we would have a different case. DAPA’s version of deferred action, however, is more than non-enforcement: It is the affirmative act of conferring “lawful presence” on a class of unlawfully present aliens.[62] Though revocable, that new designation triggers eligibility for federal[63] and state[64] benefits that would not otherwise be available.[65]
“[A]lthough prosecutorial discretion is broad, it is not ‘unfettered.’ ”[66] Declining to prosecute does not convert an act deemed unlawful by Congress into a lawful one and confer eligibility for benefits based on that new classification. Regardless of whether the Secretary has the *758 authority to offer those incentives for participation in DAPA, his doing so is not shielded from judicial review as an act of prosecutorial discretion.[67] And as shown above,[68] neither the preliminary injunction nor compliance with the APA requires the Secretary to prosecute deportable aliens or change his enforcement priorities.
Our conclusion is bolstered by the Supreme Court’s description of deferred action in AAADC:
To ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation. This commendable exercise in administrative discretion, developed without express statutory authorization, originally was known as nonpriority and is now designated as deferred action .... Approval of deferred action status means that ... no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated.[69]
Unlike the claim in AAADC, the states’ procedural claim does not involve a challenge to the Secretary’s decision to “decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation,” nor does deferred action pursuant to DAPA mean merely that “no action will thereafter be taken to proceed against an apparently deportable alien.” Under DAPA, “[d]eferred action ... means that, for a specified period of time, an individual is permitted to be lawfully present in the United States,”[70] a change in designation that confers eligibility for federal and state benefits on a class of aliens who would not otherwise qualify.[71] Therefore, DAPA “provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to'determine whether the agency exceeded its statutory powers.”[72]
*759 c.
“There is no judicial review of agency action Vhere statutes [granting agency discretion] are drawn in such broad terms that in a given case there is no law to apply.’ ”[73] For example, “[t]he allocation of funds from a lump-sum appropriation,” Vigil, 508 U.S. at 192, 113 S.Ct. 2024, is one of “those rare circumstances where the relevant statute ‘is drawn so that a court would have no meaningful standard against which to judge the agency’s exercise of discretion.’”[74] The district court did not rule on the substantive APA claims, and we do not decide whether the Secretary has the authority to implement DAPA. We do note, however, that even granting “special deference,”[75] the INA provisions cited by the government for that proposition cannot reasonably be construed, at least at this early stage of the case, to confer unreviewable discretion.
The INA expressly identifies legal designations allowing defined classes of aliens to reside lawfully in the United States[76] and eligibility for “discretionary relief allowing [aliens in deportation proceedings] to remain in the country,”[77] including narrow classes of aliens eligible for deferred action.[78] The Act also specifies classes of aliens eligible[79] and ineligible[80] for work *760 authorization, including those “eligible for work authorization and deferred action,” supra note 78. Although the Secretary is given discretion to make immigration decisions based on humanitarian concerns, that discretion is authorized for particular family relationships and specific forms of relief.[81] Congress has developed an intricate process for unlawfully present aliens to reside lawfully (albeit with legal status as opposed to lawful presence) in the United States on account of their child’s citizenship.[82] Moreover, judicial review of many decisions is expressly limited or precluded, supra note 54, including some that are made in the Secretary’s “sole and unre-viewable discretion.”[83]
Against that background, we would expect to find an explicit delegation of authority to implement DAPA — a program that makes 4.3 million otherwise removable aliens eligible for lawful presence, work authorization, and associated benefits — but no such provision exists.[84] Perhaps the closest is § 1324a(h)(3),[85] a definitional provision[86] that does not mention lawful presence or deferred action.
Likewise, we do not construe the broad grants of authority in 6 U.S.C. § 202(5),[87] 8 U.S.C. § 1103(a)(3),[88] or § 1103(g)(2)[89] as *761 assigning unreviewable “decisions of vast ‘economic and political significance’ ”[90] to an agency. Presumably because there is no specific statutory basis for DAPA, the United States suggests that its authority is grounded in historical practice, but that “does not, by itself, create power.”[91] Even assuming that an amalgamation of historical practice,[92] congressional acquiescence, the immigration context, and the INA provide authority for DAPA, it would be bold and premature for us to conclude that an as-yet-undefined delegation is beyond the scope of judicial review.
Our decision in Perales is not to the contrary. There, we .recognized that the IMS’s decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens was committed to agency discretion because “there is nothing in the [INA] expressly providing for the grant of employment authorization or pre-hearing voluntary departure ... to [that class of aliens].” Perales, 903 F.2d at 1047. “An agency’s inaction in such a situation is necessarily exempt from judicial review because there are no meaningful standards against which to judge the agency’s exercise of discretion.” Id. In this case, however, issuing work authorizations to DAPA beneficiaries is an affirmative action, and whether the Secretary has the authority to do so remains an open question.
And even assuming the Secretary has that power, it is the designation of lawful presence itself — the prerequisite' for work authorization under DAPA — that causes Texas’s injury because a document showing legal presence makes one eligible for a driver’s license.[93] The Secretary’s authori *762 ty to grant lawful presence was not at issue in Perales. Moreover, in Perales, id. at 1048, the Attorney General had explicit statutory discretion to authorize pre-hear-ing voluntary departures' — discretion the INA does not specifically confer here.
The government asserts that 8 C.F.R. § 274a.12(c)(14),[94] rather than DAPA, makes aliens granted deferred action eligible for work authorizations. But if DAPA’s class-based deferred action program, on which work authorizations are contingent, must be subjected to the notice-and-comment process, then work authorizations may not be validly issued pursuant to it until that process has been completed. And again, it is DAPA’s version of deferred action itself — the designation of “lawful presence” — that causes Texas’s injury.[95]
VI.
Because the United States has not made a strong showing that judicial review is precluded, we must decide whether it has made a strong showing that DAPA does not require notice and comment. The government does not dispute that DAPA is a rule[96]; it urges instead that DAPA is exempt as an “interpretative rule[], general statement! ] of policy, or rule[ ] of agency organization, procedure, or practice,” § 553(b)(A), or “a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts,” § 553(a)(2). “The APA’s. notice-and-eomment exemptions must be narrowly construed’ ” and if a rule is “substantive,” all “notice-and-eomment requirements must be adhered to scrupulously.” [97]
A.
The government’s main argument is that DAPA is a policy statement. We consider two criteria to determine whether a purported policy statement is actually a substantive rule: whether it (1) “impose[s] any rights and obligations” and (2) “genuinely leaves the agency and its decisionmakers free to exercise discretion.” [98] There is some overlap between *763 those criteria “because ‘[i]f a statement denies the decisionmaker discretion in the area of its coverage ... then the statement is binding, and creates rights or obligations.’ ”[99] “While mindful but suspicious of the agency’s own characterization, we ... focus[ ] primarily on whether the rule has binding effect on agency discretion or severely restricts it.”[100]
Extrapolating from the implementation of DACA,[101] the district court determined that “[njothing about DAPA
‘genuinely leaves the agency and its [employees] free to exercise discretion,’ ”[102] a finding that is reviewed for clear error. Although the DACA Memo instructed agencies to review applications on a case-by-case basis and exercise discretion, the court found that those statements were “merely pretext” because only around 5% of the 723,000 applications have been denied.[103] “Despite a request by the [district] [c]ourt, the [g]overnment’s counsel did not provide the number, if any, of requests that were denied [for discretion *764 ary reasons] even though the applicant met the DACA criteria....”[104] The court’s finding was also based on a declaration by Kenneth Palinkas, the president of the union representing the USCIS employees processing the DACA applications, that “DACA applications are simply rubberstamped if the applicants meet the necessary criteria,” id,.; DACA’s Operating Procedures, which “contains nearly 150 pages of specific instructions for granting or denying deferred action,” id. at-, 2015 WL 648579 at *55 (footnote omitted); and mandatory language in the DAPA Memo, id. at —, — n. 103, 2015 WL 648579 at *39, *56 n. 103.
The agency’s characterization of both the DACA and DAPA criteria exudes discretion — using terms such as “guidance,” “case-by-case,” and “prosecutorial discretion.” [105] But a rule can be binding if it is “applied by the agency in a way that indicates it is binding,” [106] and the states offered evidence from DACA’s implementation that DAPA’s discretionary language was pretextual. The programs are not completely analogous, however: Many more persons are eligible for DAPA,[107] and eligibility for DACA was restricted to a younger population — suggesting that DACA applicants are less likely to have backgrounds that would warrant a discretionary denial. The DAPA Memo also contains more discretionary criteria: Applicants must not be “an enforcement priority as reflected in the [Prioritization Memo]; and [must] present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.” [108] Despite those differences, there are important similarities: The Secretary “directed] USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion,” [109] and there was evidence that the DACA application process itself did not allow for discretion, regardless of the approval rate.
We are attentive to the difficulty of evaluating an agency’s discretion where the action involves issuing benefits to self-selecting applicants, as distinguished from imposing obligations on a regulated industry. Although a person who expected to be denied DACA relief for discretionary reasons would be unlikely to apply, the self-selection issue is mitigated by the district court’s finding that “the [government has publicly declared that it will make no attempt to enforce the law against even those who are denied deferred action (absent extraordinary circumstances).” Tex *765 as, — F.Supp.3d at —, 2015 WL 648579 at *50.
Moreover, the court did not rely exclusively on DACA’s approval rate. It also considered the detailed nature of the DACA Operating Procedures and the declaration from Palinkas that, as with DACA, the DAPA application process itself would preclude discretion: “[R]outing DAPA applications through service centers instead of field offices ... created an application process that bypasses traditional in-person investigatory interviews with trained US-CIS adjudications officers” and “prevents officers from conducting case-by-case investigations, undermines officers’ abilities to detect fraud and national-security risks, and ensures that applications will be rubber-stamped.”
There was conflicting evidence on the degree to which DACA allowed for discretion. Donald Neufeld, the Associate Director for Service Center Operations for USCIS, declared that “deferred action under DACA is a ... case-specific process” that “necessarily involves the exercise of the agency’s discretion” and purported to identify several instances of discretionary denials.[110] Although he stated that officials made approximately 200,000 requests for more evidence after receiving DACA applications, the government does not know the number, if any, that pertained to discretionary factors rather than the objective criteria. Likewise, the government did not offer the number of cases service center officials referred to field offices for interviews.[111] The United States has not made a strong showing that it was clearly erroneous to find that DAPA would not genuinely leave the agency and its employees free to exercise discretion.[112]
B.
A lack of discretion does not trigger notice-and-comment rulemaking if the rule is one “of agency organization, procedure, or practice,” § 553(b)(A); agencies and their employees are of course expected to adhere to such rules. We use “the substantial impact test [as] the primary means ... [to] look beyond the label ‘procedural’ to determine whether a rule is of the type Congress thought appropriate for public participation.”[113] “An agency *766 rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply.”[114] DAPA modifies substantive rights and interests — conferring lawful presence on 500,000 illegal aliens in Texas forces the state to choose between spending millions of dollars to subsidize driver’s licenses and changing its law.
The District of Columbia Circuit has enunciated a more intricate process for distinguishing between procedural and substantive rules.[115] The court first looks at the “effect on those interests ultimately at stake in the agency proceeding.” [116] “Hence, agency rules that impose ‘derivative,’ ‘incidental,’ or ‘mechanical’ burdens upon regulated individuals are considered procedural, rather than substantive.” [117] Further, “a procedural rule generally may not ‘encode [ ] a substantive value judgment Or put[] a stamp of approval or disapproval on a given type of behavior,’ ”[118] but “the fact that the agency’s decision was based on a value judgment about procedural efficiency does not convert the resulting rule into a substantive one.”[119] “A corollary to this principle is that rules are generally considered procedural so long as they do not ‘change the substantive standards by which the [agency] evaluates’ applications which seek a benefit that the agency has the power to provide.”[120]
Applying those standards here yields the same result as does the substantial-impact test. Although the burden DAPA imposes on Texas is derivative of issuing lawful presence to beneficiaries, it is still substantial — Texas has a quasi-sovereign interest in not being forced to choose between incurring millions of dollars in costs and changing its laws. Moreover, DAPA establishes the “substantive standards by which the [agency] evaluates applications which seek a benefit that the agency has the power to provide” — a critical fact requiring notice and comment.[121] Further, *767 receipt of those benefits implies a “stamp of approval” from the government.
C.
' Section 553(a)(2) exempts rules “to the extent that there is involved'... a matter relating to ... public property, loans, grants, benefits, or contracts.” § 553(a)(2). We construe the public-benefits exception very narrowly as applying only to agency action that “clearly and directly relate[s] to ‘benefits’ as that word is used in section 553(a)(2).”[122]
To the extent that DAPA relates to public benefits, it does not do so “clearly and directly.” Although § 553(a)(2) suggests that “rulemaking requirements for agencies managing benefit programs are ... voluntarily imposed,”[123] USCIS, which is the agency tasked with evaluating DAPA applications, is not such an agency. Neither USCIS nor any other agency within DHS confers public benefits on DAPA beneficiaries. Further, lawful presence is an immigration classification, not a grant of money, goods, services, or any other kind of public benefit that has been recognized, or was likely to have been recognized,[124] under this exception.[125] To the extent that lawful presence triggers eligibility for public benefits, receipt of those benefits depends on compliance with programs managed by other agencies. See supra notes 10-14 and accompanying text.
In summary, the United States has not made a strong showing that it is likely to succeed on the merits. We proceed to examine the remaining factors of the test for obtaining a stay pending appeal.
VII.
The remaining factors also favor the states. The United States has not demonstrated that it “will be irreparably injured absent a stay.” Planned Parenthood, 734 F.3d at 410 (quoting Nken, 556 U.S. at 426, 129 S.Ct. 1749). It claims that the injunction offends separation of powers and federalism, but it is the resolution of the case on the merits, not whether the *768 injunction is stayed pending appeal, that will affect those principles.
The government urges that DHS will not be able to determine quickly whether illegal aliens it encounters are enforcement priorities, but even under the injunction, DHS can choose whom to remove first; the only thing it cannot do is grant class-wide lawful presence and eligibility for accompanying benefits as incentives for low-priority aliens to self-identify in advance. And the government’s allegation that the injunction is delaying preparatory work is unpersuasive. Injunctions often cause delays, and the government can resume work if it prevails on the merits.
The states have shown that “issuance of the stay will substantially injure” them. Id. (quoting Nken, 556 U.S. at 426, 129 S.Ct. 1749). A stay would enable DAPA beneficiaries to apply for driver’s licenses and other benefits, and it would be difficult for the states to retract those benefits or recoup their costs even if they won on the merits. That is particularly true in light of the district court’s findings regarding the large number of potential beneficiaries, including at least 500,000 in Texas alone.
The last factor, “whére the public interest lies,” id. (quoting Nken, 556 U.S. at 426, 129 S.Ct. 1749), leans in favor of the states. The government identifies several important interests: It claims a stay would improve public safety and national security, provide humanitarian relief to the family members of citizens and lawful permanent residents, and increase tax revenue for state and local governments. To the contrary, however, and only by way of example, on March 16, 2015, the Attorney General, in opposing a motion to stay removal in an unrelated action, argued to this very panel that “granting a stay of removal ... would impede the government’s interest in expeditiously ... controlling immigration into the United States.”[126] Presumably, by referring to “the government’s interest,” the United States is referring to “the public interest.”
The states say the injunction maintains the separation of powers and ensures that a major new policy undergoes notice and comment. And as a prudential matter, if the injunction is stayed but DAPA is ultimately invalidated, deportable aliens would have identified themselves without receiving the expected benefits. The public interest favors maintenance of the injunction, and even if that were not so, in light of the fact that the first three factors favor the states and that the injunction merely maintains the status quo while the court considers the issue,[127] a stay pending appeal is far from justified.[128]
VIII.
The government maintains that the nationwide scope of the injunction is an *769 abuse of discretion, so it asks that the injunction be confined to Texas or the plaintiff states; But partial implementation of DAPA would undermine the constitutional imperative of “a uniform Rule of Naturalization”[129] and Congress’s instruction that “the immigration laws of the United States should be enforced vigorously and uniformly.”[130] A patchwork system would “detract[ ] from the ‘integrated scheme of regulation’ created by Congress.” [131] Further, there is a substantial likelihood that a partial injunction would be ineffective because DAPA beneficiaries would be free to move between states.
The motion to stay the preliminary injunction or narrow its scope pending appeal is DENIED.

. This opinion refers to the defendants collectively as "the United States" or "the government” unless otherwise indicated.

. Memorandum from Janet Napolitano, Sec’y, Dep't of Homeland Sec., to David Aguilar, Acting Comm’r, U.S. Customs and Border Prof., et al., at 1 (June 15, 2012) (the "DACA Memo”), available at http://www.dhs.gov/xlib rary/assets/sl-exercising-prosecutorial-dis-cretionindividuals-who-came-to-us-as-chil-dren.pdf.

. Id. (stating that the individual may be considered if he "[1] came to the United States under the age of sixteen; [2] has continuously resided in the United States for a[sic] least five years preceding [June 15, 2012] and is present in the United States on [June 15]; [3] is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the [military]; [4] has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and [5] is not above the age of thirty”).

. Id. at 2.

. Id. at 3.

. See Texas, — F.Supp.3d at —, 2015 WL 648579, at *4.

. Memorandum from Jeh Johnson, Sec'y, Dep’t of Homeland Sec., to Leon Rodriguez, Dir., U.S. Citizenship and Immigration Servs., et al., at 3-4 (Nov. 20, 2014) (the "DAPA Memo”), available at http://www.dhs. gov/sites/defaull/files/publications/l 4_1120_ memo_deferred_action.pdf. First, the "age restriction excluding] those who were older than 31 on the date of the [DACA] announcement ... will no longer apply.” Id. at 3.

. Id. at 4 (stating that individuals may be considered if they "[1] have, on [November 20, 2014], a son or daughter who is a U.S. citizen or lawful permanent resident; [2] have continuously resided in the United States since before January 1, 2010; [3] are physically present in the United States on [November 20, 2014], and at the time of making a request for consideration of deferred action with USCIS; [4] have no lawful status on [November 20, 2014]; [5] are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and [6] present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.”).

. Id. at 2 (emphasis added). As the United States admits in its opening brief at 45-46, "lawful presence,” unlike "legal status,” is not an enforceable right to remain in fhe United States and can be revoked at any time. But "lawful presence” does have significant legal consequences, as we will explain.

. Brief for the United States at 48-49 (citing 8 U.S.C. § 161 l(b)(2)-(3)). With limited exceptions, "an alien who is not a qualified alien ... is not eligible for any Federal public benefit,” § 1611(a), but that prohibition does "not apply to any benefit payable under title II of the Social Security Act [42 U.S.C. § 401 et seq.] to an alien who is lawfully present in the United States as determined by the Attor *745 ney General,” § 1611(b)(2), or "to any benefit payable under title XVIII of the Social Security Act (relating to the medicare program) [42 U.S.C. § 1395 et seq.] to an alien who is lawfully present in the United States as determined by the Attorney General and, with respect to benefits payable under part A of such title [42 U.S.C. § 1395c et seq.], who was authorized to be employed with respect to any wages attributable to employment which are counted for purposes of eligibility for such benefits,” § 1611(b)(3) (alterations in original).

. DAPA Memo, supra note 7, at 4.

. Brief of the United States at 49 (citations omitted) (citing 42 U.S.C. § 405(c)(1)(B), (4), (5)(A)-(J); 8 C.F.R. § 1.3(a)(4)(vi); 20 C.F.R. §§ 422.104(a)(2), 422.105(a)).

. Texas, — F.Supp.3d at — n. 64, 2015 WL 648579, at *44 n. 64; see also 26 U.S.C. § 32(c)(1)(E), (m) (stating that eligibility for earned income tax credit is limited to individuals with Social Security numbers); 20 C.F.R. §§ 422.104(a)(2), 422.107(a), (e)(1).

. See Tex. Transp. Code § 521.142(a) ("An applicant who is not a citizen of the United States must present ... documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver’s license.”); Tex. Lab.Code § 207.043(a)(2) ("Benefits are not payable based on services performed by an alien unless the alien ... was lawfully present for purposes of performing the services....”); see also 26 U.S.C. § 3304(a)(14)(A) (approval of state laws making compensation payable to aliens who are "lawfully present for purposes of performing such services”).

. There is some confusion — not necessarily in this case but generally — regarding the proper term for non-citizens who are in the United States unlawfully. The leading legal lexicographer offers the following compelling explanation:
The usual and preferable term in [American English] is illegal 'alien. The other forms have arisen as needless euphemisms, and should be avoided as near-gobbledygook. The problem with undocumented is that it is intended to mean, by those who use it in this phrase, "not having the requisite documents to enter or stay in a country legally.” But the word strongly suggests "unaccounted for” to those unfamiliar with this quasi-legal jargon, and it may therefore obscure the meaning.
More than one writer has argued in favor of undocumented alien ... [to] avoid[ ] the implication that one’s unauthorized presence in the United States is a crime.... But that statement is only equivocally correct: although illegal aliens' presence in the country is no crime, their entry into the country is.... Moreover, it is wrong to equate illegality with criminality, since many illegal acts are not criminal. Illegal alien is not an opprobrious epithet: it describes one present in a country in violation of the immigration laws (hence "illegal”).
Bryan A. Garner, Garner’s Dictionary of Legal Usage 912 (Oxford 3d ed.2011) (citations omitted).

. The court considered but ultimately did not rely on two other theories. The first was that the states could sue as parens patriae on behalf of citizens injured by economic competition from DAPA beneficiaries. Texas, — F.Supp.3d at — - —, 2015 WL 648579, at *18-20. The second was that, in light of Massachusetts v. EPA, 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007), the states could sue based on the losses they suffer from illegal immigration generally. Texas, — F.Supp.3d at — - —, 2015 WL 648579, at *21-28.

. The issues in this case were not resolved by Crane v. Johnson, 783 F.3d 244, 247 (5th Cir.2015), which held "that neither the [Immigration and Customs Enforcement] Agents nor the State of Mississippi has demonstrated the concrete and particularized injury required to give them standing” to challenge DACA. Mississippi lacked standing because it failed to allege facts indicating that its costs had increased or would increase as a result of DACA. Id. at 252. The agents lacked standing because, inter alia, they had not alleged a sufficient factual basis for their claim that an employment action against them was "certainly impending” if they "exercise[d] [their] discretion to detain an illegal alien.” Id. at 254. That conclusion was informed by the express delegation of discretion on the face of the DACA Memo and the fact that no sanctions or warnings had yet been issued. Id. at 254-55. We expressly declined to address the driver’s license theory, id. at 252 n. 34, and did not hold that deferred action under DACA was an exercise of prosecutorial discretion or that the criteria were not binding, id. at 254-55.

. Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 734 F.3d 406, 410 (5th Cir.2013) (quoting Nken v. Holder, 556 U.S. 418, 426, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)) (internal quotation marks omitted).

. Sepulvado v. Jindal, 729 F.3d 413, 417 (5th Cir.2013), cert. denied, — U.S. —, 134 S.Ct. 1789, 188 L.Ed.2d 771 (2014).

. Id. at 418 (quoting Janvey v. Alguire, 647 F.3d 585, 592 (5th Cir.2011)).

. Planned Parenthood, 734 F.3d at 410 (quoting Nken, 556 U.S. at 427, 129 S.Ct. 1749).

. The United States cites several cases for the proposition that DAPA is not justiciable. None of them resolved the question at issue here, so we consider them only to the extent that they are relevant to our analysis of the standing requirements. See Arizona v. United States, — U.S. —, 132 S.Ct. 2492, 2497, 183 L.Ed.2d 351 (2012) (where standing was not at issue); Heckler v. Chaney, 470 U.S. 821, 823, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (addressing availability of judicial review under APA but not standing); Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 886, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (where standing was not at issue); Plyler v. Doe, 457 U.S. 202, 205, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (same); Fiallo v. Bell, 430 U.S. 787, 788, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (same); Mathews v. Diaz, 426 U.S. 67, 69, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) (same); Linda R.S. v. Richard D., 410 U.S. 614, passim, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (addressing standing in a different context); Henderson v. Stalder, 287 F.3d 374, passim (5th Cir.2002) (same); Texas v. United States, 106 F.3d 661, 664 n. 2 (5th Cir.1997) (assuming but not deciding that Texas had standing to seek payment from government for expenses associated with illegal immigration); United States v. Cox, 342 F.2d 167, 170 (5th Cir.1965) (en banc) (where standing was not at issue).

. See Clapper v. Amnesty Int’l USA, — U.S. —, 133 S.Ct. 1138, 1148, 185 L.Ed.2d 264 (2013) (" ‘The party invoking federal jurisdiction bears the burden of establishing’ standing. ...” (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992))); Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 52 n. 2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (“[T]he presence of one party with standing is sufficient to satisfy Article Ill's case-or-controversy requirement.”). The decision in Lexmark International, Inc. v. Static Control Components, Inc., — U.S. —, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014), casts doubt on whether the limitations often described as prudential standing requirements should be considered as part of the standing inquiry. See id. at 1386-88; see also Superior MRI Servs., Inc. v. Alliance Healthcare Servs., Inc., 778 F.3d 502, 505-06 (5th Cir.2015) (discussing Lexmark's impact). We need not address that, because there is no suggestion that the states are attempting to assert a third party’s rights or to seek adjudication of a generalized grievance, and we must apply the zone-of-interests test to determine whether judicial review is available under the APA. See generally Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 474-75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (listing prudential-standing requirements).

. Amnesty Int’l, 133 S.Ct. at 1147 (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010)).

. Id. (second alteration in original) (quoting Whitmore v. Arkansas, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)).

. See Tex. Dep't of Pub. Safety, Verifying Lawful Presence 4 (2013), available at https:// www.txdps.state.tx.us/DriverLicense/ documents/verifyingLawfulPresence.pdf (listing acceptable document for "[p]erson granted deferred action'' as "[¡Immigration documentation with an alien number or 1-94 number”); supra, text accompanying note 9.

. Texas, — F.Supp.3d at —, 2015 WL 648579, at *11. The court noted that some of those costs are attributable to Texas’s participation in the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 302 (codified as amended in scattered sections of 8 and 49 U.S.C.). Id. To comply with that law, a state must, inter alia, use the federal Systematic Alien Verification for Entitlements system to verify an applicant’s immigration status. 6 C.F.R. § 37.13(b)(1). The court found that the average fee Texas pays to use .that system is $0.75 per applicant. Although states are not required to participate in the REAL ID Act, nonparticipating states' licenses are not valid for access to certain federal facilities and eventually will not be valid for commercial air travel without a secondary form of identification. REAL ID Enforcement in Brief, U.S. Department of Homeland Security (Mar. 30, 2015), http://www.dhs.gov/real-id-enforcement-brief.

. See, e.g., Cibolo Waste, Inc. v. City of San Antonio, 718 F.3d 469, 473-74 (5th Cir.2013); Lion Health Servs., Inc. v. Sebelius, 635 F.3d 693, 699 (5th Cir.2011).

. See Texas v. United States, 497 F.3d 491, 497 (5th Cir.2007) (“Texas’s only alternative to participating in this allegedly invalid process is to forfeit its sole opportunity to comment upon Kickapoo gaming regulations, a forced choice that is itself sufficient to support standing.").

. Tex. Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 449 (5th Cir.1999) (quoting Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 601, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)).

. Id.

. See, e.g., Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1242 (10th Cir.2008); Alaska v. U.S. Dep’t of Transp., 868 F.2d 441, 443-44 (D.C.Cir.1989); Ohio ex rel. Celebrezze v. U.S. Dep’t of Transp., 766 F.2d 228, 232-33 (6th Cir.1985); cf. Diamond v. Charles, 476 U.S. 54, 62, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (noting in dictum that "a State has standing to defend the constitutionality of its statute”).

. Celebrezze, 766 F.2d at 232-33; cf. Maine v. Taylor, 477 U.S. 131, 137, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (“[A] State clearly has a legitimate interest in the continued enforceability of its own statutes.”).

. The government relies on Pennsylvania v. New Jersey, 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (per curiam), for the proposition that Texas's injury is self-inflicted. There, several states alleged that other states had unconstitutionally taxed nonresidents’ incomes. Id. at 661-63, 96 S.Ct. 2333. The plaintiffs said the challenged practices had caused them to lose tax revenue. Id. at 663, 96 S.Ct. 2333. The Court held that the plaintiffs' injuries were self-inflicted because they *750 were caused by the plaintiffs' decisions to give their residents credits for taxes paid to other states, so there was no cognizable injury. See id. at 664, 96 S.Ct. 2333. The Court later held, however, that Wyoming had standing to challenge an Oklahoma statute that decreased Wyoming’s severance-tax revenue by requiring some Oklahoma power plants to burn at least 10% Oklahoma-mined coal. See Wyoming v. Oklahoma, 502 U.S. 437, 447-50, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992).
Wyoming controls here. The plaintiffs in Pennsylvania chose to base their tax credits on other states’ tax policies; they could have used other methods to accomplish a similar result, such as basing the credits on residents' out-of-state incomes, rather than taxes actually paid to other states. By contrast, Wyoming did nothing to tie its severance tax to Oklahoma law. Like Wyoming, Texas has few options to avoid being affected by what it believes are unlawful changes to federal immigration policies: It must rely on federal immigration classifications if it seeks to issue licenses only to those lawfully present in the United States. The government acknowledges this in its motion for stay, noting that "[sjtates may choose to issue driver's licenses to deferred action recipients or not, as long as they base eligibility on federal immigration classifications rather than creating new state-law classifications of aliens.” Because Texas does not have the level of choice the plaintiffs in Pennsylvania enjoyed, its injury is not self-inflicted.

. See, e.g., NCAA v. Governor of N.J., 730 F.3d 208, 223 (3d Cir.2013); L.A. Haven Hospice, Inc. v. Sebelius, 638 F.3d 644, 656-59 (9th Cir.2011); Ross v. Bank of Am., N.A. (USA), 524 F.3d 217, 222 (2d Cir.2008); Markva v. Haveman, 317 F.3d 547, 557-58 (6th Cir.2003); see also 13A Charles Alan Wright et al., Federal Practice and Procedure § 3531.4 (3d ed.2015) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury.”).

. See, e.g., L.A. Haven Hospice, 638 F.3d at 656-57 (holding that hospice had standing to challenge regulation that allegedly increased its liability even though regulation may have also saved it money); Sutton v. St. Jude Med. S.C., Inc., 419 F.3d 568, 570-75 (6th Cir.2005) (holding that patient had standing based on increased risk from defective medical device even though his device had not malfunctioned and had benefited him).

. See supra note 26 and accompanying text.

.The fact that the CAA’s review provision is more specific than the APA’s is relevant to, but not dispositive of, our "special solicitude” analysis. The former’s specificity may suggest that Congress meant for plaintiffs to have standing to challenge procedural violations of the CAA even if they would not have standing to challenge some analogous violations of the APA. That said, we routinely hold that plaintiffs have standing to challenge failures to comply with the APA's notice-and-comment requirements, see, e.g., United States v. Johnson, 632 F.3d 912, 920-27 (5th Cir.2011), and the Tenth Circuit treats the APA's review provision as sufficient to entitle a state to "special solicitude," at least in some circumstances, see New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 694, 696 n. 13 (10th Cir.2009) (holding that the state was entitled to special solicitude where one of its claims was based on APA); Crank, 539 F.3d at 1241-42 (same where only claim was based on APA). Moreover, Texas’s interest in not being pressured to change its law is more directly related to its sovereignty than was Massachusetts’s interest in preventing the erosion of its shoreline. See supra notes 30-33 and accompanying text. Because of Texas’s substantial interest, it is entitled to "special solicitude” here even though a state may not always be entitled to that presumption when seeking review under the APA — an issue we need not decide.

. See Crank, 539 F.3d at 1241-42 (reasoning that the state was entitled to special solicitude where its asserted injury was interference with enforcement of state law); Tex. Office of Pub. Util. Counsel, 183 F.3d at 449 ("[S]tates have a sovereign interest in 'the power to create and enforce a legal code.' ” (quoting Snapp, 458 U.S. at 601, 102 S.Ct. 3260)); cf. Richardson, 565 F.3d at 696 n. 13 (state was entitled to special solicitude where its asserted injury was both harm to its land and financial loss).

. This panel heard over two hours of oral argument on this motion for stay. Government counsel was specifically asked to explain how the United States avoids the "special solicitude” language in its effort to defeat standing. Counsel acknowledged that he had no explanation.

. Clapper, 133 S.Ct. at 1150; see also, e.g., Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 131 S.Ct. 1436, 1447-48, 179 L.Ed.2d 523 (2011) (stating that taxpayers lacked standing to challenge tax credits that indirectly benefited religious schools in part because private individuals decided whether to use credits for religious schools); Whitmore, 495 U.S. at 156-57, 110 S.Ct. 1717 (concluding that death-row inmate lacked standing to challenge another inmate's death sentence in part because it was unclear whether courts would rule favorably).

. See also, e.g., McConnell v. FEC, 540 U.S. 93, 228, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (deciding that candidates lacked standing to challenge increased hard-money limits because their inability to compete was also caused by their decisions not to accept large contributions), overruled on other grounds by Citizens United v. FEC, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010); Allen v. Wright, 468 U.S. 737, 756-59, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (holding that parents lacked standing to challenge tax exemptions for racially discriminatory private schools in part because effect on their children's ability to receive education in racially integrated public school depended on whether withdrawal of exemption would cause private schools to change policies and on the number of students who would transfer to public schools if they did so), abrogated on other grounds by Lexmark, 134 S.Ct. at 1388.

. Clarke v. Sec. Indus. Ass’n, 479 U.S. 388, 396, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (quoting Ass’n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)).

. Id. at 400 n. 16, 107 S.Ct. 750 (quoting Data Processing, 397 U.S. at 156, 90 S.Ct. 827).

. Id. at 399-400, 107 S.Ct. 750 (footnote omitted).

. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, — U.S. —, 132 S.Ct. 2199, 2210, 183 L.Ed.2d 211 (2012) (quoting Sec. Indus. Ass’n, 479 U.S. at 399-400, 107 S.Ct. 750).

. Id. (quoting Sec. Indus. Ass’n, 479 U.S. at 399, 107 S.Ct. 750).

. See 8 U.S.C. § 1621 (identifying aliens ineligible "for any State or local public benefit,” § 1621(a) and noting that "[a] State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible,” § 1621(d)); United States v. Alabama, 691 F.3d 1269, 1298 (11th Cir.2012) (noting that driver’s licenses fall within definition of "public benefit” in § 1621(c)).

. U.S. Steel Corp. v. EPA, 595 F.2d 207, 214 (5th Cir.1979).

. 5 U.S.C. § 702. The government does not dispute that DAP A is a “final agency action.” See Lujan v. Nat'l Wildlife Fed’n, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

. With limited exceptions, “no court shall have jurisdiction to hear any cause or claim ' by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.” 8 U.S.C. § 1252(g).

. Reno v. Am.-Arab Anti-Discrimination Comm. (AAADC), 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (quoting § 1252(g)).

. Although “private persons ... have no judicially cognizable interest in procuring enforcement of the immigration laws,” Sure-Tan, 467 U.S. at 897, 104 S.Ct. 2803; accord Fiallo, 430 U.S. at 792, 97 S.Ct. 1473 (emphasizing government’s authority over immigration), neither the preliminary injunction nor the notice-and-comment process requires the government to enforce the immigration laws.

.See AAADC, 525 U.S. at 486-87, 119 S.Ct. 936 (listing "8 U.S.C. § 1252(a)(2)(A) (limiting review of any claim arising from the inspection of aliens arriving in the United States), [(B)] (barring review of denials of discretionary relief authorized by various statutory provisions), [ (C) ] (barring review of final removal orders against criminal aliens), [ (b)(4)(D) ] (limiting review of asylum determinations)”); see also, e.g., 8 U.S.C. §§ 1182(a)(9)(B)(v) (barring review of waiver of reentry restrictions); 1226a(b)(l) (limiting review of detention of terrorist aliens); 1229c(e) (barring review of regulations limit *756 ing eligibility for voluntary departure), (f) (limiting review of denial of voluntary departure).

. See Corley v. United States, 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant....” (quoting Hibbs v. Winn, 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004))).

. "The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, ('IIRI-RA’), Pub.L. 104-208, 110 Stat. 3009, amended the INA’s provisions pertaining to removal of aliens and enacted new judicial review provisions, codified at 8 U.S.C. § 1252.” Mejia Rodriguez v. DHS, 562 F.3d 1137, 1142 n. 12 (11th Cir.2009) (per curiam).

. See supra note 48 and accompanying text.

. See, e.g., Gulf Restoration Network v. McCarthy, No. 13-31214, 783 F.3d 227, 235 (5th Cir.2015) ("[T]here is a ‘strong presumption,’ subject to Congressional language, that 'action taken by a federal agency is reviewable in federal court.’ ” (quoting RSR Corp. v. Donovan, 747 F.2d 294, 299 n. 23 (5th Cir.1984))).

. See Arizona, 132 S.Ct. at 2499 ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must *757 decide whether it makes sense to pursue removal at all." (citation omitted)).

. Chaney, 470 U.S. at 838, 105 S.Ct. 1649 (citation omitted); see Lincoln v. Vigil, 508 U.S. 182, 190-91, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993).

. The preliminary injunction does not require the Secretary to deport any alien or to alter his enforcement priorities, and the states have not challenged the priority levels he has established. See Memorandum from Jeh Johnson, Sec’y, Dep't of Homeland Sec., to Thomas Winkowski, Acting Dir., U.S. Immigration and Customs Enforcement, et al. (Nov. 20, 2014) (the "Prioritization Memo”), available at http://www.dhs.gov/sites/default/ files/publications/14_1120_memo_p rosecutorial_discretion.pdf.

. See DAPA Memo, supra note 7, at 2; supra note 9 and accompanying text. Although "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States,” it is a civil offense. Arizona, 132 S.Ct. at 2505; see 8 U.S.C. §§ 1182(a)(9)(B)(i), 1227(a)(1)(A)-(B).

. See supra notes 10-143 and accompanying text. DAPA also tolls the recipients' unlawful presence under the INA’s reentry bars, which will benefit aliens who receive lawful presence as minors because the unlawful-presence clock begins to run only at age 18. See 8 U.S.C. § 1182(a)(9)(B)(iii). Tolling will not help most adult beneficiaries because one must have continuously resided in the United States since before January 1, 2010, to be eligible for DAPA, and therefore will likely already be subject to the reentry bar for aliens who have “been unlawfully present in the United States for one year or more.” § 1182(a)(9)(B)(i)(II), (C)(i)(I).

. See supra notes 14 and 26 and accompanying text.

. Cf. Memorandum from James Cole, Deputy Att'y Gen., to All United States Attorneys (Aug. 29, 2013) (the "Cole Memo”), available at http://www.justice.gov/iso/opa/resources/ 3052013829132756857467.pdf. The Cole Memo does not direct an agency to grant any type of affirmative benefit to anyone engaged in unlawful conduct, whereas the DAPA Memo directs an agency to grant lawful presence and provides eligibility for employment authorization and other federal and state benefits to certain illegally present aliens.

. Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (quoting United States v. Batchelder, 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979)) (internal quotation mark omitted).

. Offering lawful presence and other benefits may ultimately help the Secretary enforce immigration laws more efficiently because those benefits make deportable aliens likely to self-identify, but not all inducements fall within the narrow exception for actions "committed to agency discretion.” See Util. Air Regulatory Grp. v. EPA, — U.S. —, 134 S.Ct. 2427, 2446, 189 L.Ed.2d 372 (2014) ("An agency confronting resource constraints may change its own conduct, but it cannot change the law.”). As discussed in part V.C, infra, we do not interpret the INA, at least at this early stage of the case, as conferring unreviewable discretion on the Secretary to grant the class-based lawful presence and eligibility for benefits at issue in DAPA.

. See supra note 61.

. AAADC, 525 U.S. at 484, 119 S.Ct. 936 (emphasis added) (quoting 6 C. Gordon, S. Mailman & S. Yale-Loehr, Immigration Law and Procedure § 72.03[2][h] (1998)); accord Johns v. Dep’t of Justice, 653 F.2d 884, 890 (5th Cir.1981) ("The Attorney General also determines whether (1) to refrain from (or, in administrative parlance, to defer in) executing an outstanding order of deportation, or (2) to stay the order of deportation.” (footnote omitted)); see also Yoon v. INS, 538 F.2d 1211, 1213 (5th Cir.1976) (per curiam). Those decisions do not address the unique features of DAPA — class-wide eligibility, derived from a child’s legal status, for lawful presence and accompanying eligibility for work authorization and other benefits. See Prof'ls & Patients for Customized Care v. Shalala, 56 F.3d 592, 596 n. 27 (5th Cir.1995) ("[T]he fact that we previously found another FDA compliance policy guide to be a policy statement is not dispositive whether [this guide] is a policy statement.”); infra note 92 (discussing factual disputes in comparison between DAPA and previous deferred-action programs).

. DAPA Memo, supra note 7, at 2 (emphasis added).

. See supra notes 10-14 and accompanying text.

. Chaney, 470 U.S. at 832, 105 S.Ct. 1649. Having concluded that DAPA’s version of deferred action — at least to the extent that it *759 confers lawful presence — is not an exercise of enforcement discretion committed to agency action, we do not reach the issue of whether the presumption against review of such discretion is rebutted. See id. at 832-34, 105 S.Ct. 1649; Adams v. Richardson, 480 F.2d 1159, 1161-62 (D.C.Cir.1973) (en banc) (per curiam).

. Perales v. Casillas, 903 F.2d 1043, 1047 (5th Cir.1990) (alteration in original) (quoting Overton Park, 401 U.S. at 410, 91 S.Ct. 814) (internal quotation marks omitted).

. Vigil, 508 U.S. at 191, 113 S.Ct. 2024 (quoting Chaney, 470 U.S. at 830, 105 S.Ct. 1649).

. Texas, 106 F.3d at 666 ("Courts must give special deference to congressional and executive branch policy choices pertaining to immigration.”).

. E.g., lawful-permanent-resident ("LPR”) status, see 8 U.S.C. §§ 1101(a)(20), 1255; nonimmigrant status, see §§ 1101(a)(15), 1201(a)(1); refugee and asylum status, see §§ 1101(a)(42), 1157-59, 1231(b)(3); humanitarian parole, see § 1182(d)(5); temporary protected status, see § 1254a. Cf. §§ 1182(a) (inadmissible aliens), 1227(a)-(b) (deportable aliens).

. Arizona, 132 S.Ct. at 2499 (citing 8 U.S.C. §§ 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure)); see also § 1227(d) (administrative stay of removal for T- and U-visa applicants (victims of human trafficking, or of various serious crimes, who assist law enforcement)).

. See 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (certain petitioners for immigration status under the Violence Against Women Act of 1994 (“VAWA”), Pub. L. No. 103-322, tit. IV, § 40701(a), 108 Stat. 1796, 1953-54); USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (immediate family members of LPRs killed by terrorism); National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694-95 (immediate family members of LPRs killed in combat and granted posthumous citizenship); see also 8 U.S.C. § 1227(d)(2) ("The denial of a request for an administrative stay of removal [for T- and U-visa applicants] shall not preclude the alien from applying for ... deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws....”).

. E.g., 8 U.S.C. §§ 1101(f)(2) (human-trafficking victims in lawful-temporary-resident status pursuant to a T visa), 1105a(a) (nonim-migrant battered spouses), 1154(a)(l)(K) (grantees of VAWA self-petitions), 1158(c)(1)(B), (d)(2) (asylum applicants and grantees), 1160(a)(4) (certain agricultural workers in lawful-temporary-resident status), 1184(c)(2)(E), (e)(6) (spouses of L- and E-visa holders), (p)(3)(B) (certain victims of criminal activity in lawful-temporary-resident status pursuant to a U visa), 1254a(a)(1)(B) (temporary-protected-status holders), 1255a(b)(3)(B) (temporary-resident-status holders).

. E.g., 8 U.S.C. §§ 1226(a)(3) (limits on work authorizations for aliens with pending removal proceedings), 1231(a)(7) (limits on work authorizations for aliens ordered removed).

. See e.g., 8 U.S.C. §§ 1182(a)(9)(B)(v), (C)(iii) (authorizing waiver of reentry bars for particular classes of inadmissible aliens), 1227(a)(1)(E)(iii) (authorizing waiver of inadmissibility for smuggling by particular classes of aliens), 1229b(b)(1)(A), (D) (authorizing cancellation of removal and adjustment of status if, inter alia, "the alien has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application” and "removal would result in exceptional and extremely unusual hardship to the alien’s spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence” (emphasis added)).

. In general, an applicant must (i) have a child who is at least 21 years old, (ii) leave the United States, (iii) wait 10 years, and then (iv) obtain a family-preference'visa from a United States consulate. See 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255. DAPA allows a parent to derive lawful presence from his or her child's LPR status, although the INA does not contain a family-sponsorship process for parents of an LPR child. See 8 U.S.C. §§ 1151(b)(2)(A)(i), 1152(a)(4), 1153(a).

. E.g., 8 U.S.C. §§ 1613(c)(2)(G), 1621(b)(4), 1641.

. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ("[W]e must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.”).

. "As used in this section, the term ‘unauthorized alien’ means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General.”

. See Whitman v. Am. Trucking Ass’ns, Inc., 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.”).

. "The Secretary ... shall be responsible for ... [establishing national immigration enforcement policies and priorities.”

. "The Secretary ... shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.”

. "The Attorney General shall establish such regulations, prescribe such forms of bond, *761 reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.”

. Util. Air, 134 S.Ct. at 2444 (quoting Brown & Williamson); accord id. ("When an agency claims to discover in a long-extant statute an unheralded power to regulate ‘a significant portion of the American economy,’ we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast ‘economic and political significance.’ ” (citation omitted) (quoting Brown & Williamson, 529 U.S. at 159, 120 S.Ct. 1291)); Perales, 903 F.2d at 1051 ("The mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely unreviewable under the ‘committed to agency discretion by law’ exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised.” (quoting Robbins v. Reagan, 780 F.2d 37, 45 (D.C.Cir.1985) (per curiam))).

. Medellin v. Texas, 552 U.S. 491, 532, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (quoting Dames & Moore v. Regan, 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981)); but see NLRB v. Noel Canning, — U.S. —, 134 S.Ct. 2550, 2560, 189 L.Ed.2d 538 (2014) (“[T]he longstanding ‘practice of the government,’ can inform our determination of ‘what the law is.’ ” (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 401, 4 L.Ed. 579 (1819), and Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803))).

. Many aspects of previous deferred-action programs have not been precisely explained at this early stage of the litigation, particularly whether they granted "lawful presence” or were purely non-enforcement decisions, whether the beneficiaries were merely given a temporary reprieve while transitioning from one lawful status to another, whether the programs were interstitial to a statutory legalization scheme, whether they are comparable in scale and scope to DAPA, and whether Congress’s failure to enact the DREAM Act bears on its acquiescence to DAPA. Because the district court has not yet resolved those factual issues, historical practice does not clarify our understanding of the .reviewability of DAPA.

. See supra notes 14 and 26 and accompanying text.

. “An alien who has been granted deferred action, an act of administrative convenience to the government which gives - some cases lower priority, [may be able to obtain work authorization upon application] if the alien establishes an economic necessity for employment.”

. See supra notes 14 and 26 and accompanying text. Moreover, it would be reasonable to construe § 274a.12(c)(14) as pertaining only to those classes of aliens identified by Congress as eligible for deferred action and work authorization. See supra note 78.

. The APA defines a “rule” as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes [various substantive agency functions] or practices bearing on any of the foregoing.” 5 U.S.C. § 551(4).

. Prof'ls & Patients, 56 F.3d at 595 (quoting United States v. Picciotto, 875 F.2d 345, 347 (D.C.Cir.1989)); see Pickus v. U.S. Bd. of Parole, 507 F.2d 1107, 1112 (D.C.Cir.1974) ("[T]he interested public should have an opportunity to participate, and the agency should be fully informed, before rules having ... substantial impact are promulgated.”).

. Prof'ls & Patients, 56 F.3d at 595 (quoting Cmty. Nutrition Inst. v. Young, 818 F.2d 943, 946 (D.C.Cir.1987) (per curiam)); see also Vigil, 508 U.S. at 197, 113 S.Ct. 2024 (describing general statements of policy "as 'statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.’ ” (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979))); id. (“Whatever else may be considered a ‘general statement] of policy,’ the term surely includes an announcement ... that an agency will discontinue a discretionary allocation of unrestrict *763 ed funds from a lump-sum appropriation.” (alteration in original)); Brown Express, Inc. v. United States, 607 F.2d 695, 701 (5th Cir.1979) ("A general statement of policy is a statement by an administrative agency announcing motivating factors the agency will consider, or tentative goals toward which it will aim, in determining the resolution of a [s]ubstantive question of regulation.”).

. Gen. Elec. Co. v. EPA, 290 F.3d 377, 382 (D.C.Cir.2002) (quoting McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317, 1320 (D.C.Cir.1988)).

. Prof'ls & Patients, 56 F.3d at 595 (footnote omitted); accord id. ("[W]e are to give some deference, 'albeit not overwhelming,’ to the agency’s characterization of its own rule.” (quoting Cmty. Nutrition Inst. v. Young, 818 F.2d at 946) (internal quotation marks omitted)); Phillips Petroleum Co. v. Johnson, 22 F.3d 616, 619 (5th Cir.1994) ("This court, however, must determine the category into which the rule falls: '[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact.’ ” (alteration in original) (quoting Brown Express, 607 F.2d at 700)).

. See Gen. Elec., 290 F.3d at 383 ("[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding.”); 3 Jacob A. Stein et al.. Administrative Law § 15.05[3] (2014) ("In general, the agency’s past treatment of a rule will often indicate its nature.”).

. Texas, — F.Supp.3d at —, 2015 WL 648579, at *55 (second alteration in original) (quoting Prof'ls & Patients, 56 F.3d at 595). To the extent that the government maintains that the proper focus of the inquiry into the binding nature of the DAPA Memo is on whether the agency has bound itself — -rather than on whether agency officials have bound their subordinates — the government confuses the test for determining whether a purported policy statement is actually a substantive rule with the notice-and-comment. exception for internal directives, discussed infra part VLB. An agency action is not exempt as a policy statement just because the agency purports to retain discretion; whether the agency in fact retains discretion is determined, at least in part, by whether its decisionmakers are actually free to exercise discretion. See supra notes 98-100 and accompanying text. Of course, as discussed infra part VLB, a lack of discretion by subordinates does not necessarily mean that a directive is subject to notice and comment; subordinates are expected to adhere to internal directives.

. See id. at — - —, — n. 101, 2015 WL 648579 at *4-5, *55 n. 101. Of the at least 1.2 million persons who qualify for DACA, approximately 723,000 had applied through 2014. About 636,000 had been accepted, some decisions were still pending, and only about 5% had been denied, with the top reasons being the following: “(1) the applicant used the wrong form; (2) the applicant failed to provide a valid signature; (3) the applicant failed to file or complete Form 1-765 or failed to enclose the fee; and (4) the applicant was below the age of fifteen and thus ineligible to participate in the program.” Id. at —, 2015 WL 648579 at *4-5.

. Id. at —, 2015 WL 648579 at *5. The parties submitted over 200 pages of briefing over a two-month period, supported by more than 80 exhibits. The district court held a hearing on the motion for a preliminary injunction and heard extensive argument from both sides and "specifically asked for evidence of individuals who had been denied for reasons other than not meeting the criteria or technical errors with the form and/or filing.” Id. at — n. 101, 2015 WL 648579 at *55 n. 101.

. See DACA Memo, supra note 2; DAPA Memo, supra note 7.

. Gen. Elec., 290 F.3d at 383; accord McLouth Steel, 838 F.2d at 1321-22 (reviewing historical conformity as part of determination of whether rule was substantive or non-binding policy, despite language in rule indicating that it was policy statement); id. at 1321 (“More critically than EPA’s language ... its later conduct applying it confirms its binding character.”).

. Approximately 1.2 million persons are eligible for DACA and 4.3 million for DAPA. See Texas, — F.Supp.3d at —, —, 2015 WL 648579, at *4, *55.

. DAPA Memo, supra note 7, at 4.

. Id. (emphasis added).

. The states dispute whether those denials were actually discretionary or instead were required because of failures to meet DACA’s objective criteria.

. Neufeld stated that "[ujntil very recently, USCIS lacked any ability to automatically track and sort the reasons for DACA denials.” Although the district court did not hold an evidentiary hearing or make a formal credibility determination as to the conflicting statements by Neufeld and Palinkas, the record indicates that it did not view the Neufeld declaration as creating a material factual dispute. Following a hearing on the preliminary injunction, the government filed a surreply containing the Neufeld declaration. Although the government did not seek an evidentiary hearing, the states requested one if the “new declarations create a fact dispute of material consequence to the motion.” No such hearing was held, and the court cited the Palinkas declaration favorably, Texas, — F.Supp.3d at —, — n. 13, — n. 55, 2015 WL 648579 at *5, *8 n. 13, *38 n. 55, but described the Neufeld declaration as providing insufficient detail, id. at —, — n. 101, 2015 WL 648579 at *5, 55 n. 101.

. Because DAPA is much more than a non-enforcement policy, which is presumptively committed to agency discretion, see supra part V.B, requiring it to go through notice and comment does not mean that a traditional nonenforcement policy would also be subject to those requirements, assuming that a party even had standing to challenge it. Moreover, a nonenforcement policy may be exempted as a rule "of agency organization, procedure, or practice.” See infra part VI.B.

. U.S. Dep’t of Labor v. Kast Metals Corp., 744 F.2d 1145, 1153 (5th Cir.1984); accord Stein, supra note 101, § 15.05[5] ("Procedural *766 and practice rules have been distinguished from substantive rules by applying the substantial impact test.”).

. Kast Metals, 744 F.2d at 1153; accord Brown Express, 607 F.2d at 701-03.

. Compare Kaspar Wire Works, Inc. v. Sec’y of Labor, 268 F.3d 1123, 1132 (D.C.Cir.2001) (recognizing that the D.C. Circuit has expressly rejected "the Fifth Circuit's 'substantial impact’ standard for notice and comment requirements”), with City of Arlington, Tex. v. FCC, 668 F.3d 229, 245 (5th Cir.2012), aff'd, — U.S. —, 133 S.Ct. 1863, — L.Ed.2d — (2013) ("The purpose of notice- and-comment rulemaking is to assure fairness and mature consideration of rules having a substantial impact on those regulated.” (quoting United States v. Johnson, 632 F.3d 912, 931 (5th Cir.2011))), and Phillips Petroleum, 22 F.3d at 620 (reaffirming substantial impact test announced in Brown Express).

. Nat'l Sec. Counselors v. CIA, 931 F.Supp.2d 77, 107 (D.D.C.2013) (quoting Neighborhood TV Co. v. FCC, 742 F.2d 629, 637 (D.C.Cir.1984)).

. Id. (quoting Am. Hosp. Ass’n v. Bowen, 834 F.2d 1037, 1051 (D.C.Cir.1987)).

. Id. (alterations in original) (quoting Am. Hosp., 834 F.2d at 1047).

. Id. (quoting James V. Hurson Assocs., Inc. v. Glickman, 229 F.3d 277, 282 (D.C.Cir.2000)).

. Id. (alteration in original) (quoting JEM Broad. Co. v. FCC, 22 F.3d 320, 327 (D.C.Cir.1994)).

. Id. (alteration in original) (quoting JEM Broad., 22 F.3d at 327) (internal quotation marks omitted). Compare JEM Broad., 22 F.3d at 327 ("The critical fact here, however, is that the 'hard look’ rules did not change the substantive standards by which the FCC evaluates license applications...."), with Reeder v. FCC, 865 F.2d 1298, 1305 (D.C.Cir.1989) (per curiam) (stating that notice and com *767 ment is required for "rules [that] changed substantive criteria for” evaluating station allotment counter-proposals).

. Baylor Univ. Med. Ctr. v. Heckler, 758 F.2d 1052, 1061 (5th Cir.1985); accord Hous. Auth. of Omaha, Neb. v. U.S. Hous. Auth., 468 F.2d 1, 9 (8th Cir.1972) (“The exemptions’of matters under Section 553(a)(2) relating to 'public benefits,' could conceivably include virtually every activity of government. However, since an expansive reading of the exemption clause could easily carve the heart out of the notice provisions of Section 553, it is fairly obvious that Congress did not intend for the exemptions to be interpreted that broadly.”).

. Alcaraz v. Block, 746 F.2d 593, 611 (9th Cir.1984).

. The Departments of Agriculture, Health and Human Services, and Labor have waived the exemption for matters relating to public property, loans, grants, benefits, or contracts. See 29 C.F.R. § 2.7 (Department of Labor); Public Participation in Rule Making, 36 Fed. Reg. 13,804, 13,804 (July 24, 1971) (Department of Agriculture); Public Participation in Rule Making, 36 Fed. Reg. 2532, 2532 (Jan. 28, 1971) (Department of Health and Human Services, then known as Health, Education, and Welfare).

.See e.g., Vigil, 508 U.S. at 184, 196, 113 S.Ct. 2024 (clinical services provided by Indian Health Service for handicapped children); Hoerner v. Veterans Admin., No. 88-3052, 1988 WL 97342 at *1-2 & n. 10 (4th Cir. July 8, 1988) (per curiam) (unpublished) (benefits for veterans); Baylor Univ. Med. Ctr., 758 F.2d at 1058-59 (Medicare reimbursement regulations issued by Secretary of Health and Human Services); Rodway v. U.S. Dep’t of Agric., 514 F.2d 809, 813 (D.C.Cir.1975) (food stamp allotment regulations).

. Respondent's Opposition to Petitioner’s Motion To Stay Removal at 8, El Asmar v. Holder, No. 15-60155 (5th Cir. filed Mar. 16, 2015) (citing Nken, 556 U.S. at 436, 129 S.Ct. 1749).

. Cf., e.g., Veasey v. Perry, 769 F.3d 890, 892-95 (5th Cir.2014) (discussing the importance of maintaining the status quo in the election context because a change could cause substantial disruption that would be difficult to undo).

.An invalid rule does not necessarily result in vacatur; depending on the circumstance, the appropriate remedy may be remand to the agency. That determination is made by evaluating whether “(1) the agency’s decision is so deficient as to raise serious doubts whether the agency can adequately justify its decision at all; and (2) vacatur would be seriously disruptive or costly.” N. Air Cargo v. USPS, 674 F.3d 852, 860-61 (D.C.Cir.2012). The government has not asked for remand, and it would be premature for us to weigh those considerations at this early stage.

. U.S. Const. art. I, § 8, cl. 4 (emphasis added).

. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384 (emphasis added).

. Arizona, 132 S.Ct. at 2502 (quoting Wis. Dep’t of Indus., Labor & Human Relations v. Gould Inc., 475 U.S. 282, 288-289, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986)).