BROWN, Circuit Judge,
concurring:
Today we hold that the elected Sheriff of the nation’s fourth largest county, located mere miles from our border with Mexico, cannot challenge the federal government’s deliberate nonenforcement of the immigration laws. I agree with my colleagues that the state of the law on standing “requires, or at least counsels, the result here reached.” Haitian Refugee Ctr. v. Gracey, 809 F.2d 794, 798 (D.C.Cir.1987). But, recognizing that Sheriff Arpaio’s claims reflect the widespread perception that the administration’s prosecutorial discretion meme is constitutionally problematic, I write separately to emphasize the narrowness of today’s ruling, and note the consequences of our modern obsession with a myopic and constrained notion of standing.
Sheriff Joseph Arpaio of Maricopa County, Arizona, filed suit to prevent the President from implementing programs deferring the removal of certain undocumented immigrants from the United States. These programs, referred to as Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans (DAPA), generally delay removal proceedings for undocumented immigrants who pass a background check and satisfy specified eligibility criteria. See Memorandum from Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children 1 (June 15, 2012), J.A. 101; Memorandum from Jeh Charles Johnson, Exercising Prosecutorial *26 Discretion with Respect to Individuals Who Came to the United States as Children and With Respect to Certain Individuals Who are Parents of U.S. Citizens or Permanent Residents 1 (Nov. 20, 2014), J.A. 145. Those who qualify receive authorization to work and reside in the United States for renewable periods.
What the government views as permissible prosecutorial discretion, Sheriff Arpaio views as a violation of the President’s duty to “take Care that the Laws be faithfully executed,” U.S. CONST, art. II, § 3, and the non-delegation doctrine. Sheriff Ar-paio also identifies potential procedural violations, contending the orders fail to comply with notice-and-comment procedures required by the Administrative Procedure Act.
Sheriff Arpaio’s problems with the challenged policies run deeper than a difference in philosophy or politics. He claims DACA and DAPA impose clear and “severe[ ]” harms on his ability to protect the people of Maricopa County. Compl. ¶ 27. In particular, he argues that deferring removal proceedings and providing work authorizations to undocumented immigrants “harmed ... his office’s finances, workload, and interfere[d] with the conduct of his duties....” Id. He attributes an influx of undocumented immigrants to the Department’s non-enforcement policies, and claims it corresponded with a rise in crime. Increased crime means increased costs for the Sheriff, who must run the jails and provide deputies to police the streets.
Sheriff Arpaio’s concerns are no doubt sincere. But, as the court concludes, we cannot hear his claims because he lacks standing to proceed. Under our standing jurisprudence, the injuries he claims resulted from DACA and DAPA are simply too inexact and speculative. Consequently, we must affirm the district court’s dismissal of the complaint.
Some may find today’s outcome perplexing. Certainly Sheriff Arpaio cannot be blamed for believing he had standing. The relevant judicial guideposts do not exactly “define[ ]” standing “with complete consistency.” Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.; 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). And some eases suggest standing can be satisfied based on fairly ephemeral injuries and attenuated theories of causation. See, e.g., Massachusetts v. EPA 549 U.S. 497, 516-26, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007).
Indeed, at first blush, Sheriff Arpaio’s allegations appear somewhat similar to those the Supreme Court found sufficient to secure standing in Massachusetts v. EPA. That case revolved around EPA’s decision not to regulate greenhouse gas emissions in new vehicles. Then, as now, standing consisted of a tripartite test. Plaintiffs must show they were or will be concretely injured by an action fairly traceable to the defendant and redressable by the court. See Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 102-04, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The rules are somewhat relaxed for plaintiffs who, like Massachusetts and Sheriff Arpaio, seek to vindicate a procedural right, including “the right to challenge agency action unlawfully withheld.” Massachusetts, 549 U.S. at 517,127 S.Ct. 1438. Procedural rights claims can proceed “without meeting all the normal standards for re-dressability and immediacy.” Id. at 517-18, 127 S.Ct. 1438 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 572 n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Massachusetts received a further benefit. As a sovereign state, it was “entitled to special solicitude in [the] standing analysis.” Id. at 520, 127 S.Ct. 1438.
*27 Massachusetts, like Sheriff Arpaio, believed the federal government had “abdicated its [statutory] responsibility” to protect the State’s interests. Id. at 505, 127 S.Ct. 1438. The State, like the Sheriff, asked the Court to construe the meaning of a federal statute, “a question eminently suitable to resolution in federal court.” Id. at 516, 127 S.Ct. 1438. And Congress had authorized challenges to the EPA, id., just as Congress has generally authorized the type of challenge Sheriff Arpaio now pursues, see 5 U.S.C. § 704; see also Texas v. United States, 787 F.3d 733, 751-52 (5th Cir.2015).
The Supreme Court ultimately found that Massachusetts’ injury lay in the potential loss of coastal land caused by the threat of rising seas. The Court said “the rise in sea levels associated with global warming has already harmed and will continue to harm Massachusetts.” Massachusetts, 549 U.S. at 526, 127 S.Ct. 1438. Scientific evidence suggested a causal relationship between greenhouse gases and atmospheric warming. The Court brushed aside EPA’s argument that Massachusetts had only a generalized grievance widely shared by others. The global nature of global warming did not negate the state’s claimed concrete injury. See id. at 522-23, 127 S.Ct. 1438.
Just as EPA’s inaction harmed Massachusetts’ shores, inaction on immigration is said to harm Sheriff Arpaio’s streets. Immigration, like global warming, affects the entire nation. But that does not mean no one has standing to challenge the concrete effects of the federal government’s immigration policies. “[W]here a harm is concrete, though widely shared, the Court has found ‘injury in fact.’ ” FEC v. Akins, 524 U.S. 11, 24, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998).
Based on these facial similarities, someone in Sheriff Arpaio’s shoes may well believe he has standing. After all, Massachusetts sets out a “loosened standard” under which “any contribution of any size to a cognizable injury” seems to be “sufficient for causation, and any step, no matter how small,” seems to be “sufficient to provide the necessary redress.” Jonathan H. Adler, Standing Still in the Roberts Court, 59 CASE W. RES. L. REV. 1061, 1078 (2009). Under that elastic framework, the risk of harm, however tenuously linked to the challenged government action, appears to suffice to show standing.
Despite initial appearances, Massachusetts does not support the Sheriff’s standing. Preliminarily, perhaps sensing that Massachusetts’ broad-based claim could not satisfy the ordinary rules of standing, the Court lowered the bar, ruling that state litigants were “entitled to special solicitude” in the standing calculus. Massachusetts, 549 U.S. at 520, 127 S.Ct. 1438. In addition to being special, the solicitude the Massachusetts’ Court manufactured was highly selective: cast in concerns over state sovereignty, see id. at 518-20, 127 S.Ct. 1438, this bit of doctrinal favoritism likely does not extend to non-state litigants like the Sheriff, who must clear the ordinary hurdles to standing. The Sheriff falls short, largely for the reasons addressed below.
Without the laxity afforded to state litigants, Sheriff Arpaio’s arguments for causation are overly speculative. At bottom, Sheriff Arpaio avers that DACA and DAPA inspired a flood of immigration which led, in turn, to increased crime. His injury rests on the behavior of third parties, undocumented immigrants who chose to commit crime. “[I]t is ordinarily substantially more difficult to establish” standing based on the actions of third parties. Lujan, 504 U.S. at 562, 112 S.Ct. 2130 (internal quotations ■ omitted). The Sheriff has not met that higher burden. *28 The link between DACA and DAPA — programs designed for non-criminals — and crimes committed by undocumented immigrants is too attenuated and susceptible to intervening factors.[1] See, e.g., Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel, 792 F.2d 1172, 1178 (D.C.Cir.1986) (“[T]he presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied.”). Lacking grounds for special treatment under Massachusetts, Sheriff Arpaio has not satisfied the demands of our standing doctrine.
■Finally, the central difference between ' this case and Massachusetts may be much more practical in nature: Massachusetts, unlike Sheriff Arpaio, did its homework. The State hired experts and introduced detailed information suggesting a causal relationship between certain gases, atmospheric warming and a rise in sea levels. See Massachusetts, 549 U.S. at 521-23, 127 S.Ct. 1438. Sheriff Arpaio instead can show potential costs but not causation, owing largely to the difficulty of showing causation in cases dependent on third-party behavior. Without more, his claim cannot survive the scrutiny of our modern, formalistic approach to standing.
Today’s holding puts the consequences of our standing jurisprudence in stark relief. If an elected Sheriff responsible for the security of a county with a population larger than twenty-one states[2] cannot bring suit, individual litigants will find it even more difficult to bring similar challenges. But today’s decision, however broad it may seem, is actually quite narrow in two respects.
First, our decision holds only that Sheriff Arpaio lacks standing to challenge DACA and DAPA, not that those programs are categorically shielded from suit. Indeed, those programs are currently subject to challenge in a number of other circuits. See Texas, 787 F.3d at 747-55 (upholding Texas’ standing to challenge DAPA based on the costs of providing drivers licenses to DAPA beneficiaries); Ariz. DREAM Act Coal. v. Brewer, No. 15-15307, 81 F.3d 795, 2015 WL 300376 (9th Cir.2015) (ordering the parties, and inviting the federal government, to file briefs discussing whether DACA violates the separation of powers or the Take Care Clause of the Constitution); cf. Crane v. Johnson, 783 F.3d 244, 252 (5th Cir.2015) (holding Mississippi lacked standing to challenge .DACA because the state failed to “submit[ ] ... evidence that any DACA eligible immigrants resided in the state” or “produce evidence of costs it would incur if some DACA-approved immigrants came to the state”).
*29 Second, today’s decision does not take issue with the claim that unlawful immigration carries consequences. Indeed, the' Supreme Court has previously made clear that Sheriff Arpaio’s home state of Arizona “bears many of the consequences of unlawful immigration.” Arizona v. United States, — U.S. -, 132 S.Ct. 2492, 2500, 183 L.Ed.2d 351 (2012). “Hundreds of thousands of deportable aliens are apprehended in Arizona each year. Unauthorized aliens who remain in the State comprise, by one estimate, almost six percent of the population.” Id. In the county the petitioner is charged with policing, “these aliens are reported to be responsible for a disproportionate share of serious crime.” Id. Nothing in today’s opinion casts doubt on these conditions. The court holds only that these general conditions, without more, do not afford the right to challenge the specific federal deferred action programs at issue.
Our jurisprudence on standing has many shortcomings. As today’s decision demonstrates, standing doctrines often immunize government officials from challenges to allegedly ultra vires conduct. To understand how this deferential attitude came to pass, we must briefly consider how the standing doctrine evolved over the decades.
Academic accounts suggest that, from the time of the founding until the early twentieth century, “there was no separate standing doctrine at all.” Cass R. Sunstein, What’s Standing After Lujan? Of Citizen Suits, “Injuries, ” and Article III, 91 Mioh. L.Rev. 163, 170 (1992); accord Joseph Vining, Legal Identity: The Coming of Age of Publio Law 55 (1978) (“The word ‘standing’ ... does not appear to have been commonly used until the middle of ... [the twentieth] century.”); William A. Fletcher, The Structure of Standing, 98 Yale L.J. 221, 224-25 (1988) (“[N]o general doctrine of standing existed.”). “In early practice in England and in the United States, moreover, certain forms of action, or writs, were available to all citizens without any showing of a ‘personal stake’ or an ‘injury in fact.’ ” Alex Hemmer, Note, Civil Servant Suits, 124 Yale L.J. 758, 764 (2014). There were limits. Namely, plaintiffs could only proceed based on a cause of action rooted in common law or statute. See Sunstein, supra, at 169-70; Fletcher, supra, at 224. The absence of a free-standing, self-conscious doctrinal approach left room to challenge the government’s failure to meet its obligations. That type of claim, “the public action — an action brought by a private person primarily to vindicate the public interest in the enforcement of public obligations — has long been a feature of our English and American law.” Louis L. Jaffe, Standing to Secure Judicial Review: Private Actions, 75 Haev. L.Rev. 255, 302 (1961).
If public actions ever were a feature of our law, that is true no longer. Soon after the turn of the twentieth century, as the administrative state materialized, the Supreme Court began focusing on standing as a critical component of justiciability. See Sunstein, supra, at 179-81. In a significant 1923 case, the Court dismissed a taxpayer’s constitutional challenge to the Maternity Act of 1921, finding the taxpayer’s pecuniary interest in the Act to be “minute and indeterminable” and noting this scant interest was “shared with millions of other[]” citizens. Massachusetts v. Mellon, 262 U.S. 447, 487, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). In a sign of things to come, the opinion emphasized the “inconveniences” inherent in permitting challenges to widely shared grievances. Id. Emboldened justiciability doctrines along these lines served to “insulate progressive *30 and New Deal legislation” from a variety of challenges. Sunstein, supra, at 179.
In the following decades, the standing doctrine secured its footing and coalesced around the three factors we know today: injury in fact, causation and redressability. See Lujan, 504 U.S. at 560, 112 S.Ct. 2130. But hidden within these factors, and the surrounding case law, is a surprising hostility to suits seeking to redress executive branch wrongdoing. That hostility is encapsulated in the generalized grievance doctrine, which the district court below emphasized in dismissing Sheriff Arpaio’s suit. As the district court described the doctrine, “a plaintiff who seeks to vindicate only the general interest in the proper application of the Constitution and laws does not suffer the type of direct, concrete and tangible harm that confers standing and warrants the exercise of jurisdiction.” Arpaio v. Obama, 27 F.Supp.3d 185, 200 (D.D.C.2014). Separation of powers concerns underlie this approach. “Vindicating the public interest (including the public interest in Government observance of the Constitution and laws),” we are reminded, “is the function of Congress and the Chief Executive.” Lujan, 504 U.S. at 576, 112 S.Ct. 2130.
Today’s decision reaches the same conclusion as did the district court — Sheriff Arpaio lacks standing — but wisely rests on grounds other than the generalized grievance doctrine. Our antagonism to so-called generalized grievances, if unbounded, threatens multiple harms. For one thing, this doctrine gives public officials all the wrong incentives. The advice seems to be: “Never steal anything small.” Focused acts of wrongdoing against particular persons or classes of persons will probably result in injury in fact, affording standing to challenge public officials. But the larger the injury, and the more widespread the effects, the harder it becomes to show standing.
Moreover, the generalized grievance theory and related principles of contemporary standing doctrine effectively insulate immense swaths of executive action from legal challenge. Our relentless emphasis on the need to show a concrete injury caused by executive action and redressable by judicial relief makes it virtually impossible to challenge many decisions made in the modern regulatory state. Executive branch decisions crafting binding enforcement (or nonenforcement) policies, devoting resources here or there (at taxpayer expense), or creating generally applicable norms may well escape challenge. See, e.g., Hemmer, supra, at 768-69; see also Heckler v. Chaney, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (noting the “general unsuitability for judicial review of agency decisions to refuse enforcement”).
Consider this case. The Sheriffs claims on the merits may well raise a constitutionally cogent point. Despite the dazzling spin DHS puts on the DACA and DAPA programs, a categorical suspension of existing law — distinct from the case-by-case deferrals or targeted humanitarian exemptions cited as past precedent — complete with a broad-based work authorization, arguably crosses the line between implementing the law and making it. See Zachary S. Price, Enforcement Discretion and Executive Duty, 67 VAND. L. REV. 671, 759-61 (2014). And this is true even if the legislature aids and abets the usurpation. See generally Department of Homeland Security Appropriations Act of 2010, Pub.L. No. 111-83, 123 Stat. 2142, 2149 (2009); Consolidated Appropriations Act of 2014, Pub.L. No. 11376, div. F., Tit. II, 128 Stat. 5, 251 (2014) (directing the Secretary of Homeland Security to “prioritize the identification and removal of aliens *31 convicted of a crime by the severity of that crime,” but silent as to the propriety of categorically suspending existing removal laws). Neither the aggressive entrepreneurship of the executive nor the pusillanimity of the legislative branch can alter the fundamental constraints of the Constitution. See, e.g., Robert J. Delahunty & John C. Yoo, Dream On: The Obama Administration’s Nonenforcement of Immigration Laws, the DREAM Act, and the Take Care Clause, 91 Tex. L.Rev. 781, 850-56 (2013); Price, supra, at 759-61. However, although it is the denial of standing rather than its grant that undermines democratic accountability in such circumstances, concerns about the efficacy of separation of powers principles can be dismissed as “generalized grievances” no one has standing to challenge.
Separation of powers concerns surely cannot justify every application of the generalized grievance doctrine. By prohibiting abstract, general claims, the doctrine aims to ensure that the President’s “most important constitutional duty, to ‘take Care that the Laws be faithfully executed’ ” is not transferred to the courts. Lu-jan, 504 U.S. at 577, 112 S.Ct. 2130 (quoting U.S. Const, art. II, § 3). But what if the Chief Executive decides not to faithfully execute the laws? In that case our doctrine falls silent. Paying a nominal filing fee guarantees access to the federal courts, but challenge the executive’s decision to undermine the rule of law and you will likely find your fee wasted.
This court has previously emphasized the need to approach the standing of challengers to ultra vires conduct with a measure of sensitivity. In a 1987 case, we held that a non-profit providing services to Haitian refugees lacked standing, under both constitutional and prudential rubrics, to challenge the executive’s policy of interdicting Haitian refugees on the open ocean. Haitian Refugee Ctr., 809 F.2d at 796. After concluding the challengers lacked standing under Article III, the court applied the prudential standing doctrine, which asks whether a plaintiff falls within the zone of interests protected under a particular statutory or Constitutional provision. Some flexibility was in order. The challengers did not have to satisfy the zone of interest test with respect to the
constitutional and statutory powers invoked by the President in order to establish their standing to challenge the interdiction program as ultra vires. Otherwise, a meritorious litigant, injured by ultra vires action, would seldom have standing to sue since the litigant’s interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest.
Id. at 811 n. 14. While the court’s comments centered on prudential standing, they offer a useful reminder that standing doctrines — both constitutional and prudential in nature — should not be construed so narrowly as to choke legitimate challenges to ultra vires conduct. Here, the lesson is clear. We should, at the very least, give careful thought before blindly applying the generalized grievance doctrine in cases challenging federal programs as ultra vires.
The second shortcoming of our standing doctrine is this: standing has become a “lawyer’s game,” as Chief Justice Roberts phrased it. Massachusetts, 549 U.S. at 548, 127 S.Ct. 1438 (Roberts, J., dissenting). Sophisticated, well-resourced litigants can game the system, producing the types of proof that pass muster, while less sophisticated litigants may be left outside the courthouse doors. Our case law hardly provides clear guidance. Sometimes standing appears to rest on mere ipse *32 dixit. “A litigant, it seems, will have standing if he is ‘deemed’ to have the requisite interest, and ‘if you ... have standing then you can be confident you are’ suitably interested.” Flast v. Cohen, 392 U.S. 83, 130, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (Harlan, J., dissenting) (quoting Ernest J. Brown, Quis Custodiet Ipsos Custodes? — The School-Prayer Cases, 1963 Sup.Ct. Rev. 1, 22).
More broadly, our obsession with standing “presents] courts with an opportunity to avoid the vindication of unpopular rights, or even worse to disguise decision on the merits in the opaque standing terminology of injury, causation, remedial benefit, and separation of powers.” 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3531.3 (3d ed.1998).
* * *
In the not-so-distant past, Judge (and later Chief Justice) Burger could safely conclude that “experience rather than logic or fixed rules” guided the search for standing. Office of Commc’n of United Church of Christ v. FCC, 359 F.2d 994, 1004 (D.C.Cir.1966) (Burger, J.) (upholding the standing of television viewers to intervene in broadcast license renewal proceedings as “private attorneys general”). Experience and logic no longer reign supreme. In place of “functional” tests “designed to insure [sic] that only those with a genuine and legitimate interest” may come into court, id. at 1002, we now employ formalistic tests that may tend to discourage certain constitutional challenges. Today’s decision teaches a lesson: litigants bringing constitutional challenges must pay exceptionally close attention to standing requirements. The courts do — especially when litigants do not.
No doubt the modern approach to standing serves to reduce our caseload. But there are much more important matters at stake. “Some [litigants] need bread; others need Shakespeare; others need their rightful place in the national society — what they all need is processors of law who will consider the people’s needs more significant than administrative convenience.” Id. at 1005 (quoting Edmond Cahn, Law in the Consumer Perspective, 112 U. Pa. L.Rev. 1, 13 (1963)). Our approach to standing, I fear, too often stifles constitutional challenges, ultimately elevating the courts’ convenience over constitutional efficacy and the needs of our citizenry.

. Of course, in reality, the link may be no more attenuated than that connecting a potential twenty-centimeter rise in sea level with greenhouse gas emissions from new vehicles. See Massachusetts, 549 U.S. at 522, 127 S.Ct. 1438; see also Adler, supra, at 1074 n. 91 (“[T]he amount of sea-level rise that constitute[d] Massachusetts’s actual, present injury is less than 0.1cm-0.2cm per year, and the amount of projected sea-level rise that could be redressed by regulation of greenhouse gas emissions from new motor vehicles under [EPA’s regulatory authority] is even less, as U.S. motor vehicles only represent a fraction of [greenhouse gas] emissions'.”). Even so, Sheriff Arpaio has not shown that link with the particularity our precedents demand. See, e.g., Nat’l Wrestling Coaches Ass’n v. Dep’t of Educ., 366 F.3d 930, 941 (D.C.Cir.2004) (requiring "substantial evidence” in the record "of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress”).

. Maricopa County Profile, Maricopa County Open Books, http://www.maricopa.gov/Open Books/profile.aspx (last visited July 28, 2015).